UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PAUL HANKINS                                    CIVIL ACTION

VERSUS                                          NUMBER: 11-00578

MICHAEL J. ASTRUE,                              SECTION: "A"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability.  (Rec. docs. 13, 14).

Paul Hankins, plaintiff herein, filed the subject applications for DIB and SSI benefits on June 21, 2007, alleging disability as of April 24, 2005.  (Tr. pp. 93, 94-98).  In a Disability Report that appears in the record, the conditions resulting in plaintiff's

inability to work were identified as heart problems, diabetes, and hypertension. (Tr. pp. 140-147).[1]/ Plaintiff's applications for DIB and SSI benefits were denied at the initial level of the Commissioner's administrative review process on January 23, 2008. (Tr. pp. 63-66, 67-70). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on December 17, 2008 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 33-57). On December 20, 2009, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 9-21). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 5-7). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1)  [w]hether the ALJ's error in failing to allow counsel for Plaintiff to fully cross-examine the vocational expert at the December 17, 2008, hearing warrants remand.

---

[1]/ According to another Disability Report that appears in the record, plaintiff had filed a previous application for DIB that was denied at the initial level of the Commissioner's administrative review process on September 15, 2006. (Tr. pp. 125-128).

2)      [w]hether the ALJ's error in failing to consider the combined effect of Plaintiff's obesity and Plaintiff's other severe impairments warrants remand.

3)      [w]hether the ALJ's error in failing to identify skills Plaintiff acquired and that are transferable to the jobs of office clerk and cashier warrants remand.

(Rec. doc. 13-3, p. 2).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.      [t]he claimant meets the insured status requirements for Medicare coverage under Title XVIII of the Social Security Act through September 30, 2011.

2.      [t]here is currently no evidence demonstrating that [claimant] engaged in substantial gainful activity since April 24, 2005, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.      [t]he claimant has the following severe impairments: essential hypertension; diabetes mellitus; episode of congestive heart failure; morbid obesity. (20 CFR 404.1520(c) and 416.920(c); Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985) and SSR 96-3p).

4.      [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.      [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b).

6.      [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      [t]he claimant was born on July 8, 1963, and was 41-years-old, which is defined as a younger individual age

18-49, on the alleged disability onset date. He is currently 45-year old and remains within the same age classification. (20 CFR 404.1563 and 416.963).

8.   [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the ... [claimant] can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  [t]he claimant has not been under a disability, as defined in the Social Security Act, from April 24, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 15, 17, 20, 21).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson

v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1970).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled with the meaning of the Social Security Act.  Harrell v. Bowen. 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set

forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

      1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

      2. an individual who does not have a "severe impairment" will not be found to be disabled.

      3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

      4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

      5. if an individual's impairment preclude him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Alternatively, the Commissioner may rely on the Medical-Vocational Guidelines of the Regulations (the "Grids") at

the fifth step when the claimant suffers only from exertional impairments or when his non-exertional impairments do not significantly affect his residual functional capacity. Selders v. Sullivan, 915 F.2d 614, 618 (5th Cir. 1990); Fraga, 810 F.2d at 1304. Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

As noted above, a hearing de novo before an ALJ went forward in plaintiff's case on December 17, 2008. After the documentary exhibits were admitted into evidence, the ALJ remarked that the most recent of those medical records were from over one year earlier in October of 2007 and he inquired of plaintiff's attorney why that was the case. In response, counsel stated that records from the Heart Clinic of Louisiana and from Dr. Becnel had been requested and were forthcoming. (Tr. pp. 35-37). Plaintiff then took the stand and was questioned by the ALJ as to how often he obtained medical treatment. In answer to that question, plaintiff testified that he was seen every six months or more frequently if requested during which he would receive a thorough checkup. Plaintiff was then taking an ACE inhibitor but he was unsure if he was also on a blood thinner such as Coumadin or precisely who Dr. Procell, one of his treating physician, was. Plaintiff's

medication prescriptions were to be filled the following day, having last been filled one month earlier. A stress test had been attempted by him but could not be completed and his weight was essentially unchanged for the previous eight to ten years. Upon comparing a recent list of medications with one that plaintiff had completed earlier, the ALJ observed that the two were quite different. Another notation in the records indicated that plaintiff was self-employed on October 4, 2007 which plaintiff explained was a brief attempt to perform yardwork which he simply could not do. (Tr. pp. 37-40).

Deborah Bailey, a VE, was next to take the stand. She first classified plaintiff's previous job as a resident training specialist as light, low/semi-skilled work and his job doing lawncare as involving light to medium, unskilled work. Thus, if plaintiff was able to perform sedentary and light-level work he was capable of performing some of his past relevant work. After clarifying with plaintiff that he had attended junior college for two years, the ALJ posed a hypothetical question to the VE which assumed an individual of plaintiff's age and education who was limited to sedentary work. Faced with that hypothetical question, the VE testified that the described individual could perform the jobs of general office clerk or cashier, significant numbers of which existed in the local and national economies. (Tr. pp. 40-43).

8

After the VE had identified the aforementioned jobs the ALJ addressed plaintiff's counsel directly and expressed concern over being "handicapped" in not having updated medical records from plaintiff covering the previous two years. After delineating the information he was interested in obtaining, the ALJ afforded counsel the opportunity to develop the record with questioning and testimony as he saw fit so that a decision on plaintiff's applications could be made without the need for a supplemental hearing once the additional medical records were received. Counsel then proceeded to question plaintiff who testified that his heart condition had worsened and that he was now having problems with breathing. On "bad days", which had increased to three to four days per week, plaintiff had difficulty performing the activities of daily living without getting short of breath. Such episodes typically occurred upon over-exertion or upsetment and he experienced chest pain without warning every other day. Plaintiff also had a decreased energy level which left him tired and required a three to four-hour nap. He took aspirin to relieve his chest pain in addition to fluid pills. Even with those modalities he suffered from fluid increases in his legs and feet which sometimes precluded him from putting his shoes on. On his doctor's advice, plaintiff would elevate his feet for forty-five to sixty minutes per day.

In terms of his diabetes, plaintiff took thirty units of insulin daily which was up from twenty-five units. That condition had reportedly affected the nerves and veins in his fingers, hands, and legs. Plaintiff performed household chores in increments and did little grocery shopping; even cooking left him short of breath. Counsel noted that plaintiff had received unemployment benefits in 2006 but the ALJ, on further questioning of plaintiff, pointed out that those benefits had been reported as earnings. (Tr. pp. 43-51).

Following plaintiff's testimony, the ALJ again addressed plaintiff's counsel directly and explained what he wanted in terms of post-hearing submissions. The ALJ also suggested that counsel consider amending the alleged onset date of April 24, 2005 as plaintiff's earnings record reported him as receiving $19,000 in wages in 2004, $15,500 in 2005, and $3,000 in 2006. After counsel stated that he had no further questions, the ALJ provided a further admonition about allowing such matters to proceed to the hearing stage without first having obtained all of a given claimant's medical records. Ultimately, the ALJ agreed to leave the record in plaintiff's case open until January 16, 2009 to allow time for any additional supplementation. (Tr. pp. 51-56).

The documentary evidence admitted in the administrative proceedings below begins with records from the Medical Center of Louisiana at New Orleans ("MCLNO") where plaintiff was admitted for

three days for shortness of breath, lower extremity edema, new onset of congestive heart failure with an ejection fraction of less than 15%, new onset of diabetes mellitus, and community-acquired pneumonia. During his hospital stay, plaintiff was treated with Lasix, Metoprolol, and Captopril. By the time of his discharge, plaintiff was without shortness of breath and low extremity edema and he was to undergo left heart catheterization two weeks later after his pneumonia had resolved. Plaintiff's blood glucose was also brought under control during his admission and he was cough-free on the day of discharge after being treated with Avelox. The discharge diagnosis was dilated cardiomyopathy, congestive heart failure with an ejection fraction of less than 15, newly-diagnosed diabetes mellitus, community-acquired pneumonia, and hypertension. Medications included Captopril, Metoprolol, NPH insulin, Lasix, aspirin, Simvastatin, and Avelox. Various follow-up instructions were given. (Tr. pp. 180-187, 190-195).

Following his discharge from MCLNO, plaintiff underwent a complete metabolic profile on May 10, 2006 which revealed a low potassium level but elevated levels of glucose and bilirubin. (Tr. p. 189). Prescription medications were refilled on May 16, June 15, and August 16, 2005. (Tr. p. 188). Pursuant to a referral, plaintiff was next seen by Dr. Ronald Becnel on November 22, 2005 where his blood pressure was measured at 132/79 and his weight was

recorded as three hundred forty-one pounds. Among the numerous tests that were run were chest x-rays which revealed mild cardiomegaly but no evidence of active pulmonary pathology . An echocardiogram demonstrated moderate enlargement of the left atrial chamber, mild mitral annular calcification, moderate enlargement to the left ventricular chambers, and mild mitral aortic valvular sclerosis. Significant stenotic and regurgitant lesions were ruled out. ECG results were preliminarily characterized as abnormal. (Tr. pp. 199, 201-206). Plaintiff returned to Dr. Becnel to obtain the test results on December 6, 2005 and it was noted that plaintiff had yet to see a cardiologist. (Tr. pp. 198, 200).

On January 5, 2006, plaintiff was seen by Dr. Samuel Ferris of the Heart Clinic of Louisiana ("HCL") in connection with indicators of hypertension, abnormal EKG results, and diabetes mellitus. Left ventricular function was said to be normal and the estimated ejection fraction rate was greater than 50% but the cardiac dimensions were abnormal. A cardiac doppler study revealed no aortic, mitral, pulmonic, or tricuspid valvular insufficiency but the study was characterized as abnormal. (Tr. pp. 301-303). Plaintiff was next seen by Dr. Kenneth Kerut of HCL on January 19, 2006 who declared that the previously-performed echocardiogram showed normal heart function but that plaintiff's blood sugars were high at around 400. The "problem list" included an abnormal EKG,

12

obesity, hypercholesterolemia, hypertension, diabetes, possible sleep apnea, and heart failure. Plaintiff was instructed to have a sleep study and to return to HCL in three to four months. Active medications were Furosemide, Humalog, Captopril, Zocor, Spironolactone, and Toprol. (Tr. pp. 298-300).

On May 24, 2006, plaintiff was seen by a practitioner affiliated with the Operation Blessing/International Medical Alliance Disaster Response Medical Clinic ("DRMC") for the purpose of obtaining needed medications. His blood pressure was down to 128/86 and his weight had dropped to three hundred twenty-five pounds. Plaintiff's chest/lungs and heart were normal but he did have some mild pedal edema. The assessment was hypertension, congestive heart failure, and diabetes. Medications were prescribed and plaintiff was to return in mid-August. (Tr. p. 217). Plaintiff was next seen at DRMC on September 19, 2006 for another medication refill. His weight was the same as the previous visit and his blood pressure was 124/66. The assessment was hypertension, hyperlipidemia, and diabetes. The dosage of Novalin was increased and plaintiff was to be started on Metformin. (Tr. p. 216).

Plaintiff was subsequently seen at DRMC on November 6, 2006 to obtain a refill for his Lipitor. The assessment was hypertension, diabetes, and elevated lipids. Lipitor was prescribed under the

Pfizer Medication Program. (Tr. p. 215). Plaintiff requested a further medication refill on January 8, 2007 and his non-fasting blood sugar was recorded on 432. (Tr. p. 211). However, by January 10, 2007 his blood sugar level had dropped to 368. The doctor noted that plaintiff had run out of his medications three weeks earlier but had refilled his prescriptions and resumed them two days earlier. There was no edema to the lower extremities. The assessment was diabetes, not controlled but now being treated with medication; hypertension; obesity; elevated cholesterol; and, a history of congestive heart failure. Medication was prescribed and plaintiff was counseled on obtaining refills before his supply was exhausted. (Tr. p. 210). By March 6, 2007 plaintiff's weight had dropped to three hundred twenty-one pounds but his blood sugar was elevated. Plaintiff was started on Glimepiride and Metformin and was explained the consequences of uncontrolled diabetes and the need for continuous medical monitoring. The assessment was diabetes and non-compliance with treatment and hypertension. (Tr. pp. 214, 218).

On April 3, 2007, plaintiff was seen again at DRMC for a check-up, follow-up, bloodwork, and paperwork. During this visit, plaintiff received prophylactic nail and callous care and was educated on the effect of elevated blood sugar levels on his body systems, particularly his feet. The assessment was tinea pedis,

onychomycosis, pitting edema, and anhidrosis. Plaintiff was to receive special footwear and compression stockings and Metformin was prescribed. (Tr. p. 213). On April 17, 2007, plaintiff's blood pressure was 116/79, his weight was three hundred twenty-two pounds, and his non-fasting blood sugar level was 198. He arrived with appropriate footwear, was provided special insoles, and compression stockings were to be obtained. Plaintiff was to return for further nail and callous care in two to three months. (Tr. p. 212).

On August 31, 2007, plaintiff was consultatively evaluated by Dr. Miljana Mandich of Internal Medicine Associates of New Orleans, LLC. The doctor recalled plaintiff's in-patient admission at MCLNO in April and May of 2005 and it was reported that plaintiff had undergone an angiogram within a few weeks thereafter but plaintiff was unsure of the results. The implantation of a defibrilator had been discussed but Hurricane Katrina had interrupted that procedure from going forward. As plaintiff was then on Medicaid, he was desirous of finding a private cardiologist. Plaintiff reported experiencing shortness of breath upon walking less than one block and he slept with three pillows underneath his head. He often had a dry cough that he related to taking Captopril and he advised the doctor that he had a frequent and sometimes daily sensation of tightness in the chest for the previous three and one-half years

which occurred at rest and was relieved by relaxing and breathing slowly for ten to fifteen minutes. Medications at the time included Lipitor, Captopril, Lasix, Toprol, and Lantus Insulin.

Upon physical examination, plaintiff's blood pressure was measured at 134/74 and his weight at three hundred forty pounds. There was normal or borderline size of cardiac dullness and a regular heart rate with no murmur or gallop. Plaintiff's abdomen was very obese as were his extremities which were otherwise normal with no edema. Neurologically, muscle bulk, tone, and strength were preserved in all four extremities and sensation and reflexes were intact with no disturbances of gait. Chest x-rays revealed no evidence of active pulmonary or cardiac pathology and an electrocardiogram demonstrated a sinus tachycardia rhythm with a rate of about 100 beats per minute with borderline R-wave progression and precardial leads. The diagnosis was morbid obesity, hypertension that was well-controlled with medication, adult onset insulin dependent diabetes, and congestive heart failure/dilated cardiomyopathy with pulmonary hypertension that was diagnosed in April of 2005. Except for plaintiff's obesity, the rest of the physical examination was unremarkable. (Tr. pp. 221-229).

On September 6, 2007, plaintiff was seen at the Jefferson Community Healthcare Center ("JCHC") with presenting issues being

chest pain, hearing loss, and a request for foot and eye doctors. Plaintiff's weight at the time was just over three hundred thirty-two pounds. Unfortunately, the rest of the treatment note from that date is of poor readable quality. (Tr. p. 236). Elevated blood sugars were seen on testing and plaintiff's medications at the time were recorded. (Tr. pp. 237-238, 233).

On September 11, 2007, an Administration Examiner made a formal intra-Agency request for medical advice and an assessment of plaintiff's residual functional capacity. (Tr. p. 230). On September 14, 2007, Dr. Anthony Scardino, an Administration specialist in internal medicine, responded by suggesting that plaintiff undergo pulmonary function studies in light of his morbid obesity and complaints of shortness of breath upon walking less than one block. (Tr. p. 231). Plaintiff returned to JCHC on October 4, 2007 for a check-up and his blood pressure was measured at 117/75 and his weight was just over three hundred twenty-nine pounds. Otherwise, the treatment note is largely illegible except for a reference to plaintiff being "self-employed". Diovan was added to plaintiff's prescription regimen. (Tr. pp. 234, 233).

Plaintiff was next seen at HCL on October 10, 2007, this time by Dr. Brian Cospolich. Plaintiff's hypertension was said to be poorly controlled although it had improved since the addition of Diovan. Presenting complaints included pressure/tightness to the

chest and shortness of breath upon exertion such as mowing the lawn or engaging in light activities. Plaintiff had reportedly lost about eighty pounds in the previous eighteen months but he was still described as extremely overweight. Despite being on a combination of oral medication and insulin, plaintiff's blood sugars were not adequately controlled and he occasionally suffered from neuropathic symptoms in his toes and feet. Upon physical examination, plaintiff's blood pressure was recorded as 130/86 and his weight as two hundred fifty-one pounds. A cardiac exam revealed a regular rate and rhythm, normal PMI size and location, and no gallop or murmur. The extremities had no edema and fairly good distal pulses. An EKG produced abnormal results. The problem list included an abnormal EKG, obesity, hypercholesterolemia, hypertension, diabetes, possible sleep apnea, heart failure, and diabetic neuropathy. In the concluding portions of his report, Dr. Cospolich remarked that plaintiff was experiencing symptoms associated with atherosclerotic coronary disease. A repeat echocardiogram was to be scheduled as was a Cardiolite study to rule out ischemia. Plaintiff was to remain on his current medications pending the results of the testing at which time it would be determined whether further angiography was warranted versus medical risk reduction therapy. (Tr. pp. 294-297).

Pursuant to Dr. Scardino's request, plaintiff underwent

spirometric testing at Internal Medicine Associates on October 12, 2007, his weight being recorded as three hundred ten pounds at the time. Plaintiff's performance in the testing was fair to good but a review of the data revealed unacceptable variations in effort and plaintiff declined to undergo the post-bronchodilator portion of the study for fear of its effects on his cardiac condition. Plaintiff was thus to be asked to return to Internal Medicine Associates in an attempt to obtain reliable data. (Tr. pp. 240-244).

On October 30, 2007, Administration Examiner Kerry Green made a formal request for medical advice from a specialist in physical medicine inquiring how to proceed in light of plaintiff's failure to complete the pulmonary function studies. (Tr. p. 245). On November 2, 2007, Dr. Scardino responded with similar uncertainty given that the pre-bronchodilator study had produced results that met Listings-level severity but there were no post-bronchodilator values given plaintiff's refusal to complete the test. (Tr. p. 246).

Plaintiff returned to Internal Medicine Associates on December 21, 2007 for a repeat of the spirometric testing. However, plaintiff's cooperation was poor and indicative of significant disparity of effort and he again declined the post-bronchodilator portion of the study. The results were thus felt to be unreliable

and inappropriate for interpretation. (Tr. pp. 248-253). On that same date, plaintiff was seen by Dr. Procell of the Westcare Medical Center for a check-up and medication refills. His blood pressure was 136/86 at the time and he weighed three hundred thirty-seven pounds. Medications were dispensed. (Tr. p. 285).

Plaintiff was next seen by Dr. Procell on January 3, 2008 for complaints of a cough, fever/chills, and throat irritation and for a prescription for Prevacid to relieve indigestion. Plaintiff's blood pressure was 143/86 and his weight was just over three hundred thirty-five pounds. Medications were dispensed, including a Z-Pack and Prevacid. (Tr. p. 284). On January 11, 2008, Administrative Examiner Green made a second formal request for medical advice in light of the second incomplete pulmonary function study. (Tr. p. 254). In response, Dr. Scardino reviewed plaintiff's file on January 22, 2008 and set forth his findings in the Administration's form denominated "Physical Residual Functional Capacity Assessment". (Tr. p. 255). There, Dr. Scardino indicated that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could never climb a ladder/rope/scaffolds, could occasionally climb a ramp/stairs, and could frequently perform the other listed postural maneuvers; had

no manipulative, visual, or communicative limitations; and, was to avoid concentrated exposure to extreme cold and heat but had an unlimited ability to withstand other environmental limitations. In the concluding portions of the form, Dr. Scardino cited the results of the consultative evaluation performed by Dr. Mandich on August 31, 2007 which indicated that plaintiff had no active pulmonary pathology. The results of the pulmonary function studies did not establish Listing-level severity and although the activities of plaintiff's daily living were moderately restricted, his alleged symptoms/limitations were deemed to be only partially credible. Ultimately, Dr. Scardino concluded that plaintiff was capable of light-level work. (Tr. pp. 256-263).

On March 11, 2008, plaintiff returned to Dr. Procell for a check-up with his blood pressure being 137/82 and his weight being three hundred thirty-two pounds. An echocardiogram was performed as part of the evaluation but poor testing technique limited the diagnostic accuracy of the study. The left atrium and mitral valve were largely normal but the left ventricle exhibited chamber enlargement with mild to moderate global hypokenesis with an estimated ejection fraction of 0.35. Significant lesions were ruled out through the doppler portion of the study but the diagnostic accuracy was questioned. An ECG produced results that were characterized as abnormal. However, x-rays produced no

evidence of active pulmonary or cardiac pathology. The assessment included diabetes and elevated lipids. (Tr. pp. 273-283).

The following day, plaintiff underwent myocardial perfusion imaging at HCL which produced shortness of breath but the left ventricle was normal in size. The overall impression was that it was "probably" a normal perfusion study but clinical correlation was suggested. (Tr. pp. 292-293). Plaintiff returned to Dr. Procell on March 31, 2008 for follow-up of his hypertension and diabetes. Medication was prescribed. (Tr. pp. 271-272). On August 6, 2008, plaintiff was seen again by Dr. Procell for monitoring of his various conditions. As a result of a suspected bruit in the neck, a carotid ultrasound was performed which revealed no evidence of carotid artery stenosis. The assessment included diabetes and elevated blood pressure and lipids. (Tr. pp. 265-270).

Finally, on August 19, 2008, plaintiff returned to HCL for reevaluation of his hypertension and to obtain the results of a stress test that was performed on March 12, 2008. Medications at the time included Diovan, Lisinopril, Aldactone, Metroprolol, Niaspan, and Lipitor. Plaintiff reported numbness in his right thigh nearly every day that was not relieved by walking as well as a chest pressure sensation when mowing the lawn or over-exerting himself. A previous history of diabetes-related neuropathy symptoms was noted but no current symptoms were mentioned.

Plaintiff's weight was down to three hundred nineteen pounds and his blood pressure was 132/74. Upon physical examination, no carotid bruits were noted and a cardiac exam revealed a regular rate and rhythm, normal PMI size and location, and no gallop or murmur. The extremities were free from cyanosis, clubbing, and edema with fairly good distal pulses. The stress test that had been performed produced normal results with an ejection fraction rate of 48%. The problem list included an abnormal EKG, obesity, hypercholesterolemia, hypertension, diabetes, possible sleep apnea, heart failure, and diabetic neuropathy. The results of a previous echo study that had been performed at Westcare were to be obtained for comparison and plaintiff's hypertension was said to be fairly well controlled at the time. Plaintiff was to return to the Clinic in three months and he was given a prescription for nitroglycerin to be taken whenever he had chest pain. (Tr. pp. 288-291).

The administrative record also contains an undated "Function Report" that elicited information about plaintiff's capabilities. In that form, plaintiff indicated that he could take care of his own personal needs but that his conditions prevented him for working, engaging in sexual activity, or exercising due to a lack of stamina. He prepared his own meals and could clean and do laundry at a diminished pace but he did no yardwork as it was too taxing, made breathing difficult, and made his heart race.

Plaintiff could drive a car, go out in public alone, and go shopping for clothing, personal items, and groceries. He could also manage his personal finances. Hobbies included watching TV, occasionally going to the movies, and drawing. He visited and spoke with others on a daily basis and he attended church and bingo weekly. Plaintiff estimated that he could lift twenty pounds but could not stand for long periods of time. He further indicated that he could only walk a quarter of a mile but would need to rest for ten to fifteen minutes after half a block. Plaintiff reported that he could not climb stairs, that diabetes affected his sight, and that prescribed medication caused mood swings and impacted his memory, concentration, and ability to complete tasks. Plaintiff also checked off boxes on the form indicating that his conditions affected the use of his hands and he provided inconsistent answers to the question of whether he had problems getting along with others. He was also short-tempered due to medication, got frustrated easily, was constantly fearful of not being able to care for himself or his family, and was often depressed. (Tr. pp. 148-156).

As noted earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on three grounds, two of which are somewhat related and will thus be addressed in tandem. In the first of those grounds, plaintiff alleges that the ALJ erred

in failing to allow his counsel to fully cross-examine the VE at the administrative hearing. In his third challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to identify the skills that he had acquired from his past work that were transferable to the jobs that the VE identified at the administrative hearing that plaintiff was capable of performing.

As respects plaintiff's first challenge, at the administrative hearing that was held on December 17, 2008, the ALJ first admitted the documentary evidence into the record, observed that updated medical records on plaintiff were lacking, and then proceeded to question plaintiff about the medical care he had obtained in the recent past, occasionally directing inquiries to plaintiff's counsel on that topic. (Tr. pp. 35-40). The VE subsequently took the stand, classified plaintiff's past work as light and low/semi-skilled in nature, and testified that plaintiff could perform that work if he was able to function at the light and sedentary exertional levels. (Tr. pp. 40-43). The ALJ then directed further comments to plaintiff's counsel regarding the dearth of recent medical records, during which he stated as follows:

> But I'm going to give you the opportunity, now, to develop the record however you want with questioning and testimony. Then, I'm going to expect the records. And the reason I've gone to the VE now is so that if I concluded the records don't support a listing and we need to go to that VE, I've already

covered his past relevant work. I've covered
what happens if he can do light. I've covered
what happens if he's limited to sedentary.
So, what I'm hoping is that when you get me
the records, I'll be able to make a decision
without a supplemental hearing. <u>So</u> <u>I</u> <u>want</u> <u>to</u>
<u>turn</u> <u>it</u> <u>over</u> <u>to</u> <u>you</u>, <u>and</u> <u>you</u> <u>can</u> <u>develop</u> <u>the</u>
<u>record</u> <u>however</u> <u>you</u> <u>want</u>, <u>in</u> <u>terms</u> <u>of</u>
<u>questioning</u> [INAUDBILE].

(Tr. pp. 43-44)(emphasis added).

Following this statement by the ALJ, counsel proceeded to question plaintiff about the symptoms he was experiencing at the time and their effect on this ability to perform the activities of daily living with the ALJ occasionally interjecting and posing questions to plaintiff himself. After the ALJ encouraged counsel to consider amending the alleged onset date in light of records showing that plaintiff had earnings in 2006, counsel stated that he had no further questions. (Tr. pp. 44-52). What followed was a further admonition from the ALJ and an exchange between him and counsel about prematurely declaring that a Social Security case was ready for hearing prior to all of a claimant's treatment records being requested and obtained. The administrative hearing was then concluded. (Tr. pp. 52-56).

While an ALJ's duty to develop the record includes control over the examination of witnesses, <u>Love v. Astrue</u>, 2011 WL 4899989 at *4 (W.D. N.C. Sept. 6, 2011), <u>adopted</u>, 2011 WL 4899984 (W.D. N.C. Oct. 14, 2011), a review of the administrative hearing

transcript does not reveal that the ALJ disallowed counsel from questioning the VE or that counsel's opportunity to develop the record was in any way circumscribed. On the contrary, the ALJ invited plaintiff's counsel to develop the record with questioning and testimony as he saw fit. Although the decision to grant one is within the discretion of the ALJ, the Court also notes that plaintiff made no request for a posthearing conference under 20 C.F.R. §404.961 at which he may have persuaded the ALJ to reopen the hearing under 20 C.F.R. §404.944 to obtain further VE testimony. Plaintiff's first challenge to the Commissioner's decision is without merit.

In his third challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to identify the skills that he had acquired from his past work which were transferrable to the sedentary jobs that were identified by the VE at the administrative hearing.

At the administrative hearing that was held on December 17, 2008, the VE classified plaintiff's past job as a resident training specialist as involving light, low/semi-skilled work. She also testified that plaintiff could still perform that job if he was capable of light and sedentary-level work. Owing to plaintiff's various impairments and presumably his overall size, the ALJ posed a hypothetical question to the VE which assumed a person of

plaintiff's age and education who was limited to sedentary work. In answer to that hypothet, the VE identified two jobs that she classified as involving sedentary, unskilled work - - general office clerk and cashier - - as available jobs that the individual described in the hypothetical question could perform. The ALJ would subsequently conclude in his written decision that transferability of job skills was not material to the determination of disability because a finding of "not disabled" may be based on the ability to do unskilled work like that which had been identified by the VE. See Social Security Ruling ("SSR") 82-41, 1982 WL 31389 at *1.

Citing various job titles contained within the voluminous provisions of the Dictionary of Occupational Titles ("DOT"), plaintiff now argues that transferability of job skills was indeed material in this case because the DOT defines certain clerk and cashier jobs as involving semi-skilled or skilled work rather than sedentary work as was testified to by the VE. More specifically, plaintiff argues that "[t]he DOT has two titles of a general office clerk, DOT Code 209.562-010, and an administrative clerk, DOT Code 219.362-010, both are semi-skilled, light work. See DOT Codes 209.562-010, 219.362-010. Additionally, the DOT has two titles for cashier, cashier I in a clerical setting, DOT Code 211.362-010, skilled, sedentary work, and cashier-check in a retail trade setting, DOT Code 211.462-014 semi-skilled, sedentary work. See

DOT Codes 211.362-010, 211.462-014." (Rec. doc. 13-3, p. 6).  That being the case, plaintiff argues, the ALJ was obliged under SSR 83-10 to identify the specific skills that he may have acquired in his past work that were transferable to those other occupations.

Social Security Regulations provide that a claimant is considered to have skills that can be used in other jobs when the skilled or semi-skilled work activities that he has done in the past can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work.  20 C.F.R. §§404.1568(d)(1), 416.968(d)(1).  The Regulations further provide that claimants who have attended high school education and above are generally considered to be capable of semi-skilled through skilled work.  20 C.F.R. §§404.1564(b)(4), 416.967(b)(4). Moreover, if a claimant has performed semi-skilled work in the past he may reasonably be expected to perform such work in the future. Hughes v. Astrue, 2011 WL 2471377 at *5 (E.D. La. Apr. 20, 2011), adopted, 2011 WL 2470130 (E.D. La. June 21, 2011)(citing 20 C.F.R. §404.1565(a)).

Plaintiff alleges that the jobs that were identified by the VE are not unskilled jobs but rather involve semi-skilled or skilled work which thus obligated the ALJ to identify the specific job skills that he had acquired in his past work that were transferable to those other positions.  Although plaintiff is correct in

describing the skill levels for the job titles that he cites, the DOT also contains a job title of cashier II (clerical), DOT Code 211.462-010, which carries a Specific Vocational Preparation ("SVP") of 2 and is thus considered unskilled work. See SSR 00-4p, 2000 WL 1898704 at *3. Be that as it may, plaintiff testified at the administrative hearing to attending two years of junior college and the VE classified plaintiff's past work as semi-skilled. To the extent that the VE was incorrect in describing the skill requirements of the office clerk and cashier portions she identified and that both of them involved semi-skilled or skilled work, the Regulations permitted the ALJ to infer that plaintiff was capable of such work based on his educational level and past work experience. Hughes, 2011 WL 2471377 at *5. Finally, as noted above, plaintiff had an opportunity at the administrative hearing to cross-examine the VE regarding the classification of the jobs she identified but he opted not to do so. As was observed by the Fifth Circuit, "... claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." Carey v. Apfel, 230 F.3d 131, 146-47 (5th Cir. 2000).

In his final challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to consider the combined effect of his obesity and his other severe impairments, particularly the effects that his obesity has on causing or contributing to cardiovascular and respiratory impairments. A fair reading of the ALJ's decision does not bear this out.

In addressing this challenge, the Court initially notes that plaintiff never identified obesity, in and of itself, as a disabling impairment in his application for benefits or related paperwork. <u>Pierre v. Sullivan</u>, 884 F.2d 799, 802 (5th Cir. 1989). The Court also recalls plaintiff's hearing testimony that his weight was essentially unchanged for the previous eight to ten years. Yet plaintiff's weight apparently did not prevent him from working over the years up until April 24, 2005. <u>Johnson</u>, 864 F.2d at 347-48. In any event, a review of the ALJ's written decision reveals that he repeatedly and properly recognized his obligation to consider the evidence related to plaintiff's various impairments in determining whether they singly or in combination were "severe", whether they satisfied Listing-level severity, and how they affected plaintiff's residual functional capacity. (Tr. pp. 12-14). Having done so, the ALJ found at the second step of the sequential analysis that plaintiff suffered from severe impairments in the form of essential hypertension, diabetes mellitus, an episode of

congestive heart failure, and morbid obesity. (Tr. p. 15). However, those impairments, whether considered singly or in combination, did not satisfy the criteria of any of those set forth in the Listing of Impairments. (Tr. pp. 15-17). Here, the ALJ methodically discussed the medical evidence pertaining to each of plaintiff's severe impairments and, as respects obesity, opined as follows:

> [i]n this case, obesity is also [a] medically determined impairment. There is no longer a specific listing for obesity; however, Social Security Ruling 02-1p provides guidance on evaluating obesity under the listings, as well as considering its functional effects. An individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. A listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. Obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirement of a listing.
>
> The record reveals that estimates of claimant's body weight ranged between 325 and 340 pounds. (Exhs. 4F/4; 11F/2). Even considering his elevated weight, none of the claimant's medically determined impairments satisfy the relevant listing requirements for the reasons fully set forth above. Functional considerations of increased body weight will be fully considered in the residual functional capacity assessment.

> (Tr. p. 17).

Among the medical evidence that the ALJ alluded to were the results of Dr. Mandich's consultative evaluation which demonstrated

normal muscle bulk, tone, and strength in all four extremities with no pathological reflexes or disturbances of gait. (Tr. p. 17). The absence of such objective indicators can properly be considered by the ALJ in evaluating a claimant's disability status. Adams v. Bowen, 833 F.2d 509, 512 (5th Cir. 1987).

As mandated by the Regulations, 20 C.F.R., Pt. 404, Supt. P., App. 1, Section 1.00(Q), the ALJ also properly considered the effect of plaintiff's obesity in determining his residual functional capacity, as follows:

> [a]s to claimant's obesity, it is not medically indicated that claimant's body weight, in-and-of itself, is specifically precluding movements and/or basic exertional activities. His weight remains within a range that is medically considered obese, but it is not alleged that adipose tissue inhibits movement in any extremity. The consultative examination showed that claimant retains full range of motion in the spine and back. Extremities were characterized as obese, but no limitations in range of motion or deficits in fine or gross motor manipulations were identified. (Exh. 4F). Sleep apnea, which can occur concurrently with obesity, has not been medically diagnosed. Claimant's excess weight is recognized as [an] ancillary factor insofar as it is some hindrance to overall mobility. In addition, weight loss could likely be of medical benefit in terms of long-term health maintenance and enhanced serum glucose management; however, none of claimant's conditions have proven medically unmanageable specifically because of high body weight. In sum, even considering claimant's body weight, the evidence fails to support a conclusion that any of his impairments are

> attended by signs and symptoms that could be
> expected to preclude performance of work
> activities within the sedentary exertional
> range.

(Tr. p. 18).

In arriving at that residual functional capacity assessment, the ALJ recalled the exertional demands of sedentary work and noted that those were below that associated with activities like mowing the lawn which plaintiff admitted he was capable of. (Tr. p. 19). In the Function Report that he completed, plaintiff also admitted that he prepared his own meals, could clean and do laundry, could drive a car and go shopping, attended church and bingo on a weekly basis, and could walk a quarter of a mile. The ALJ may properly consider such reports in determining a claimant's disability status. Vaughn v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995). The record also reflects that plaintiff requested and was prescribed drugs for erectile dysfunction on a number of occasions which supports the inference that he was healthy enough to engage in sexual activity. (Tr. pp. 211, 215, 216, 285). Plaintiff's ability to engage in the aforementioned activities is not indicative of someone who is precluded from performing all work activities. Anderson v. Sullivan, 887 F.2d 630, 632 (5th Cir. 1989); Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987). See also Leggett v. Chater, 67 F.3d 558, 565 n. 12 (5th Cir. 1995)(court may properly

consider claimant's daily activities).

Finally, the ALJ duly noted that none of plaintiff's treating physicians had imposed any limitations on his physical abilities, another proper consideration. Leggett, 67 F.3d at 565; Vaughn, 58 F.3d at 131. Addressing Dr. Scardino's assessment of plaintiff's residual functional capacity, the ALJ opined as follows:

> [a]t the time of initial determination, a state medical consultant for Disability Determination Services completed an assessment indicating that claimant retained the residual functional capacity for a somewhat reduced range of light work. I find that claimant is further limited as light work can involve standing and walking for up to six hours a day. In further considering the impact of a claimant's body weight and his subjective allegations as to shortness of breath, I conclude that a somewhat greater extent of additional limitation is warranted. However, I concur with the state medical consultant to the extent that the evidence does not support a conclusion that claimant's impairments prevent any and all work. (SSR 96-6p).
>
> In sum, the above residual functional capacity assessment is supported by the amount and routine nature of medical intervention necessary to manage claimant's medical conditions and the stability of symptoms achieved with routine medical follow-up. Claimant's subjective allegations, when considered in context of the full record, do not warrant further reduction of his residual functional capacity.

(Tr. pp. 19-20).

Dr. Mandich found that plaintiff was not suffering from any

35

active pulmonary pathology and because plaintiff twice refused to complete the spirometric testing without good cause, the ALJ was left to make a decision on plaintiff's applications based on the information that was available. 20 C.F.R. §§404.1516, 416.916. He did so and concluded that plaintiff was capable of sedentary work. In light of the foregoing, the Court believes that the ALJ gave proper consideration to the effect that plaintiff's obesity would have on his ability to do work.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this 2nd day of _____August_____, 2012.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE